# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                               Case No.  04-35800

LARRY GENE CUPP
PEGGY JO CUPP

        Debtors


LONE STAR EPOXIES

        Plaintiff and
        Counter-Defendant

        v.                              Adv. Proc. No.  05-3014

PEGGY J. CUPP

        Defendant and
        Counter-Plaintiff


## M E M O R A N D U M


**APPEARANCES:**    JAMES M. MOORE, ESQ.
      706 Walnut Street
      Suite 501
      Knoxville, Tennessee  37902
      Attorney for Plaintiff / Counter-Defendant

      JENKINS & JENKINS ATTYS., PLLC
      Michael H. Fitzpatrick, Esq.
      Suite 2121, First Tennessee Plaza
      800 South Gay Street
      Knoxville, Tennessee  37929
      Attorneys for Defendant / Counter-Plaintiff


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint to Determine Dischargeability of Debt filed by the Plaintiff on February 3, 2005, as amended by the Amended Complaint to Determine Dischargeability of Debt filed on March 28, 2005 (collectively, Complaint), seeking a determination that, pursuant to 11 U.S.C.A. § 523(a)(2) (West 2004), a state court judgment obtained against the Defendant/Debtor is nondischargeable. On April 8, 2005, the Debtor filed an Answer, denying the Plaintiff's allegations, which was followed by an Answer and Counter Claim filed on April 20, 2005, again denying the Plaintiff's allegations and averring that the Plaintiff willfully violated the automatic stay thus entitling her to actual and punitive damages pursuant to 11 U.S.C.A. § 362 (West 2004). On February 7, 2006, after obtaining leave from the court, the Debtor filed an Answer and Amended Counter Claim, additionally asking the court to permanently enjoin the Plaintiff from seeking restitution in a criminal matter pending against her in Dallas County, Texas.

The trial was held on March 7, 2006. The record before the court consists of the testimony of the parties and nineteen exhibits introduced into evidence.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(G), (I) (West 1993).

# I

In November 2002, the Debtor formed Concrete Maintenance Specialists, Inc. (Concrete Maintenance), a closely-held corporation created to provide concrete finishing, of which she was the sole shareholder and president. The Debtor did not participate in the daily operations of the business, which was managed and operated by her son, Rick Guider. Shortly after its formation,

2

Concrete Maintenance contacted the Plaintiff, a manufacturer of construction materials used primarily for floor and concrete repair, for the purpose of purchasing supplies and materials for use in its business.  On December 10, 2002, the Plaintiff shipped materials to Concrete Maintenance, along with an invoice for $20,000.00, which was to be paid upon receipt.  *See* TRIAL EX. 14. Concrete Maintenance did not remit payment for the materials; however, during a trip to Texas by the Debtor and Mr. Guider in January 2003, the Plaintiff received a check in the amount of $20,000.00, drawn on Concrete Maintenance's checking account, representing payment of the December 10, 2002 invoice.  This check, however, was returned by Concrete Maintenance's bank for insufficient funds.

Over the course of 2003, Concrete Maintenance faced financial difficulties and was unable to pay its accounts, including those with the Plaintiff.  Nevertheless, despite the nonpayment of its earlier invoice and the $20,000.00 insufficient funds check, the Plaintiff continued to supply Concrete Maintenance with supplies and materials between December 17, 2002, and February 13, 2003, represented by invoices totaling $38,437.46.  *See* TRIAL EX. 8; TRIAL EX. 14.  Additionally, between February and August 2003, the Plaintiff continued to supply materials to Concrete Maintenance on the condition that payment in the form of bank transfer or credit card was received prior to shipment.

During the summer of 2003, Concrete Maintenance attempted to obtain a loan from American Fidelity Bank (American Fidelity) in order to bring its accounts, including that of the Plaintiff, current.  During the underwriting process, and at the request of the Plaintiff's owner, Arthur Fischl, American Fidelity sent a letter to the Plaintiff on August 29, 2003, advising that it

3

expected the loan to close in September 2003.  *See* TRIAL EX. 7.  This letter was signed by an

assistant vice president for American Fidelity and by the Debtor.  Also during this time, Concrete

Maintenance was working on a job for the Flying J Truck Stop.  In October 2003, Concrete

Maintenance asked the Plaintiff, through Mr. Fischl, to advance materials without pre-payment,

stating that once the job was completed, it would be able to pay the Plaintiff's outstanding invoices.

Mr. Fischl personally contacted the Flying J Truck Stop, and after confirmation of the job's status,

the Plaintiff shipped materials invoiced at $15,562.80 to Concrete Maintenance on October 16, 2003.

*See* TRIAL EX. 14.  Concrete Maintenance did not, however, pay for these materials.

On February 16, 2004, the Plaintiff sent a letter addressed to the Debtor, as President of

Concrete Maintenance, demanding payment of $51,785.51 in invoices for materials shipped

between December 17, 2002, and December 15, 2003, and stating that "in the instance of the NSF

Check for $20,000.00, if payment is not received by certified funds immediately underlined criminal charges

will be filled [sic] with the Attorney General having jurisdiction."  TRIAL EX. 6.  In April 2004, and

again in August 2004, the Plaintiff, through Mr. Fischl, contacted the Blount County District

Attorney General about pursuing criminal charges against the Debtor, which he declined to pursue.

*See* TRIAL EX. 4; TRIAL EX. 5.  Mr. Fischl also contacted the Attorney General's office for Dallas

County, Texas, and on August 12, 2005, the grand jury for Dallas County, Texas, indicted the

Debtor on a felony bad check charge for the $20,000.00 check.  *See* TRIAL EX. 15.  Pursuant to this

indictment, a warrant was issued for the Debtor's arrest, and she was arrested in Blount County,

Tennessee, on December 1, 2005.  She was required to post a bond for her release.

On May 26, 2004, prior to the indictment, the Plaintiff filed civil action number L-14203, styled *Lone Star Epoxies v. Peggy J. Cupp, Richard Guider, and Concrete Maintenance Specialists*, in the Circuit Court for Blount County, Tennessee, alleging nonpayment of its account and seeking $54,000.26 "for goods and services which plaintiff has supplied to them but for which they have not been paid" and an accounting. TRIAL EX.1.   In July 2004, Mr. Guider suffered a heart attack and died on August 2, 2004.  The Debtor did not answer the Complaint or otherwise defend the lawsuit, and on September 3, 2004, a Default Judgment was entered against each of the defendants in the Blount County lawsuit.  *See* TRIAL EX. 2.  Thereafter, on November 5, 2004, the Circuit Court for Blount County, Tennessee, entered a final Judgment against the Debtor, Mr. Guider, and Concrete Maintenance in the amount of $53,110.50 plus attorney's fees of $5,311.05, for a total of $58,421.55 (Judgment).  TRIAL EX.3.

The Debtor and her husband filed the joint Voluntary Petition commencing their Chapter 7 bankruptcy case on November 3, 2004, listing the Plaintiff as an unsecured creditor in her statements and schedules, with notice also being sent to the Plaintiff's attorney in the Lawsuit.  The Plaintiff timely filed its Complaint initiating this adversary proceeding on February 3, 2005.  In its Complaint, the Plaintiff urges the court to find that the Judgment is nondischargeable, averring that the Debtor presented it with communications containing false and misleading statements, which caused the Plaintiff to extend credit to Concrete Maintenance through its president, the Debtor.  The Debtor denies the Plaintiff's allegations of fraud, arguing that the documents she provided did not contain fraudulent information.

The Debtor also asserts a counterclaim against the Plaintiff, averring that it violated the automatic stay when, acting through its owner and agent, Mr. Fischl, the Plaintiff caused a "criminal warrant" to be issued against the Debtor in the State of Texas for the $20,000.00 dishonored check for the sole purpose of collecting the money from the Debtor.[1]  The Debtor argues that this action constitutes a willful violation of the stay because Mr. Fischl was aware that the Debtor had filed for bankruptcy when he caused the "warrant" to be issued.  In its Answer to Counter-Claim filed on April 27, 2005, the Plaintiff denies violating the automatic stay.  After obtaining leave from the court, the Debtor filed an Amended Counter Claim on February 7, 2006, making the same allegations that the Plaintiff violated the automatic stay and additionally requesting injunctive relief from the court to permanently enjoin the Plaintiff from seeking or accepting restitution in the court for Dallas County, Texas.

## II

The Plaintiff contends that the $58,421.55 Judgment entered by the Blount County Circuit Court on November 5, 2004, is nondischargeable because it is based upon fraud, misrepresentation, and false financial documents.  The nondischargeability of debts is governed by 11 U.S.C.A. § 523, which provides, in material part:

---

[1] Specifically, the Debtor avers in paragraph 6 of both her Counter Claim filed on April 20, 2005, and her Amended Counter Claim filed on February 7, 2006, that "Lone Star Epoxies, by its Agent Arthur Fischl, sought to cause a criminal warrant for a dishonored $20,000.00 check on the account of Concrete Maintenance Specialists, Inc. dated January 2003 and signed by the debtor to be brought against Peggy J. Cupp in the State of Texas."  There is no evidence in the record establishing that Mr. Fischl caused a "criminal warrant" to be issued.  The record will only support a finding that the Dallas County Grand Jury returned an indictment against the Debtor for bad check charges on August 12, 2005, after which a warrant for the Debtor's arrest was issued.

(a)  A discharge under section 727[²] . . . of this title does not discharge an individual debtor from any debt—

. . . .

(2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.³]

11 U.S.C.A. § 523(a).  The Plaintiff, as the party seeking a determination of nondischargeability, bears the burden of proving the necessary elements by a preponderance of the evidence, *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991), and § 523(a) is strictly construed against the Plaintiff but liberally in favor of the Debtor.  *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003).

To satisfy § 523(a)(2)(A), the Plaintiff must prove that the Debtor obtained money, property, or services through material misrepresentations that she knew were false or that she made with gross recklessness, that the Debtor intended to deceive the Plaintiff, that the Plaintiff justifiably relied on the Debtor's false representations, and that the Plaintiff's reliance was the proximate cause of its losses.  *See Copeland*, 291 B.R. at 760 (citing *Rembert*, 141 F.3d at 280).

---

² Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C.A. § 727(b) (West 2004). This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge. *Buckeye Retirement, LLC v. Heil (In re Heil)*, 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S. Ct. 695, 699 (1934)). The Debtor's discharge was entered on February 17, 2005.

³ The Plaintiff originally also asserted a claim under 11 U.S.C.A. § 523(a)(2)(B) (West 2004), which concerns the dischargeability of debts incurred through the use of false financial documents. Following the close of the Plaintiff's proof at trial, the Debtor made an oral motion to dismiss the Plaintiff's complaint with respect to § 523(a)(2)(B). The Plaintiff did not oppose the motion, and it was granted.

7

First, the Plaintiff must prove that the Debtor engaged in conduct that was somewhat "blameworthy," and her fraudulent intent may be "inferred as a matter of fact" based on the totality of the circumstances. *Copeland*, 291 B.R. at 759 (citing *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)). Material misrepresentations, omissions, and actual fraud all fall within the scope of § 523(a)(2)(A). *Copeland*, 291 B.R. at 759; *see also Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) ("Actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions.").

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another - something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760 (quoting *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002) and *First Centennial Title Co. v. Bailey (In re Bailey)*, 216 B.R. 619, 621 (Bankr. S.D. Ohio 1997)); *see also Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983) ("For the purposes of § 523(a)(2)(A), 'false representations and pretenses encompass statements that falsely purport to depict current or past facts.'").

On the other hand,

> a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.

*EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted). Intent to deceive requires proof that the Debtor made false representations that she knew or should have known would convince the Plaintiff to provide property or services. *Copeland*, 291 B.R. at 765-66. "'Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . . A 'dumb but honest' [debtor] does not satisfy the test.'" *Copeland*, 291 B.R. at 766 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)). Fraudulent intent may be inferred by examining the Debtor's conduct to determine if she presented the Plaintiff with "'a picture of deceptive conduct . . . indicat[ing] an intent to deceive.'" *Copeland*, 291 B.R. at 766 (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).

Finally, § 523(a)(2)(A) also requires justifiable reliance by the Plaintiff; i.e.,it must prove that it actually relied on the Debtor's representations and that, based upon the facts and circumstances known to it at the time, such reliance was justifiable. *Copeland*, 291 B.R. at 767. Justifiable reliance can be found even if the Plaintiff "'might have ascertained the falsity of the representation had [it] made an investigation.'" *Copeland*, 291 B.R. at 767 (quoting *McCoy*, 269 B.R. at 198).

As the basis for its Complaint, the Plaintiff avers that, throughout the Plaintiff's relationship with Concrete Maintenance, the Debtor misled it, through its agent, Mr. Fischl, to believe that payment on the past due invoices would be forthcoming, by requesting and misrepresenting the status of various loans, whereby Mr. Fischl agreed to provide further materials. Additionally, the Plaintiff argues that the Debtor misrepresented the status of its financing with American Fidelity by having the August 29, 2003 letter sent by the bank, which led the Plaintiff to falsely believe that

9

such financing would be forthcoming, and that the Plaintiff relied on this information when it

forwarded materials without requiring payment in advance between August and October 2003.[4]  The

August 29, 2003 letter states, in its entirety, as follows:

> We at American Fidelity Bank are pleased to inform you that we are preparing our
> documents to provide financing for Concrete Maintenance Specialists on a recent
> loan request.  Per the instructions of CMS, some of the proceeds from the loan
> request will be wired to you to pay for material already on order.  The loan is
> expected to close during the first two weeks of September.  After receipt of a few
> other requested documents from CMS, and final due diligence from the bank, we will
> finalize our document preparation and set a closing on the real estate etc. . . . Should
> you need further information or have any questions, please feel free to call me at
> (865) 981-5135.  Thank you.

TRIAL EX. 7.  This letter is signed by Lee Bailey, Assistant Vice President of American Fidelity, and

the Debtor.

The Plaintiff also relies upon an August 29, 2003 letter from Kim Trentham, Concrete

Maintenance's Office Manager, to Lee Bailey with American Fidelity, which states, in part, as

follows:

> Please fax a letter today to Arthur Fischl stating the following information.
>
> Concrete Maintenance Specialist will be closing on building loan sometime around
> Sept. 5th through Sept. 10th.  At that time, American Fidelity Bank will then wire

---

[4] Although much of Mr. Fischl's testimony evidenced that a majority of the events surrounding these
controversies took place with Mr. Guider and/or other persons employed with Concrete Maintenance, and not the Debtor
individually, the Debtor allowed the Default Judgment be entered against her in the Circuit Court for Blount County,
and she is therefore collaterally estopped from raising any issues concerning her personal liability in this adversary
proceeding.  *See* 28 U.S.C.A. § 1738 (2004) ("[J]udicial proceedings . . . [of any State] shall have the same full faith and
credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . ."); *see also
Rally Hill Prods., Inc. v. Bursack (In re Bursack)*, 65 F.3d 51, 54 (6th Cir. 1995) (Under Tennessee state law, "collateral
estoppel bars relitigation of an issue if it was raised in an earlier case between the same parties, actually litigated, and
necessary to the judgment of the earlier case.") (citing *Massengill v. Scott*, 738 S.W.2d 629, 632 (Tenn. 1987)); *Booth
v. Kirk*, 381 S.W.2d 312, 315 (Tenn. Ct. App. 1963) ("[M]aterial facts or questions, which were in issue in a former
action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered therein, and
. . . such facts or questions become res judicata and may not again be litigated in a subsequent action between the same
parties.") (quoting *Cantrell v. Burnett & Henderson Co.*, 216 S.W.2d 307, 309 (Tenn. 1948)).

transfer Arthur Fischl approximately $65,000.00, which is for monies owed to Lone
Star Epoxy for material costs.

TRIAL EX. 26.  The Plaintiff argues that these letters, along with the various oral assurances of

payment made by the Debtor over the course of the parties' business relationship between December

2002 and October 2003, constituted material misrepresentations that the Debtor knew were false and

upon which the Plaintiff relied.

At trial, both the Debtor and Mr. Fischl testified that the business relationship between the

Plaintiff and Concrete Maintenance began on December 10, 2002, when the Plaintiff first provided

materials and supplies to Concrete Maintenance with an invoice value of $20,000.00.  *See* TRIAL EX.

14.  Mr. Fischl testified that, in order to help Concrete Maintenance establish its business, the

Plaintiff deviated from its normal practice of requiring payment in full prior to shipment and shipped

product without payment.  Accordingly, from December 17, 2002, until February 13, 2003, the

Plaintiff shipped materials invoiced at $38,437.46, for which it has not received payment, and which

amounts are included within the Judgment.  *See* TRIAL EX. 3; TRIAL EX. 8; TRIAL EX. 14.  After

Concrete Maintenance's check for the initial $20,000.00 December 10, 2002 shipment was

dishonored in late January 2003, the Plaintiff changed its payment terms, requiring payment in full

via bank transfer or credit card from Concrete Maintenance, which continued until August 2003.

Beginning on August 25, 2003, and continuing through October 2, 2003, the Plaintiff made

a total of five shipments to Concrete Maintenance, with invoices totaling $33,188.00, without

requiring payment in advance.  *See* TRIAL EX. 8; TRIAL EX. 14.  When questioned about this

deviation from the Plaintiff's normal payment terms at trial, Mr. Fischl testified that Concrete

Maintenance needed the materials in order to finish a job at the Flying J Truckstop, and after calling

11

to confirm this information, he agreed to forward the materials. Concrete Maintenance subsequently made payments totaling $37,000.00 between September 23, 2003, and October 10, 2003. *See* TRIAL EX. 8; TRIAL EX. 14.

Thereafter, on October 16, 2003, the Plaintiff shipped materials to Concrete Maintenance with an aggregate invoice price of $15,562.80. *See* TRIAL EX. 14. Concrete Maintenance did not pay for these materials, and they are also included within the Judgment entered into evidence as Trial Exhibit 3.[5] At trial, Mr. Fischl testified that he forwarded these materials in reliance upon the representations contained in the August 29, 2003 letter from American Fidelity and the August 29, 2003 letter from Ms. Trentham to American Fidelity concerning a loan forthcoming to Concrete Maintenance, as well as oral representations from the Debtor and other persons at Concrete Maintenance that the Plaintiff would be paid upon completion of the Flying J Truckstop job.

Based upon the record, the court finds that the Plaintiff has not met its burden of proof under § 523(a)(2)(A), and accordingly, both its Judgment and the $20,000.00 for the insufficient funds check were discharged by the Debtor on February 17, 2005. First, the court cannot find the requisite level of fraudulent intent by the Debtor necessary for a determination of nondischargeability under § 523(a)(2)(A). Nondischargeability requires an intent to defraud in the inducement, whereby the Plaintiff must prove that fraudulent intent was present when Concrete Maintenance actually incurred its debts to the Plaintiff.

---

[5] The Complaint filed by the Plaintiff in the Blount County Circuit Court requests a judgment in the amount of $54,000.26, representing the totals of the $38,437.46 in invoices for the materials shipped between December 17, 2002, and February 13, 2003, and the $15,562.80 for invoices related to materials shipped on October 16, 2003. The Judgment, however, is for $53,110.50, or $889.76 less than the amount prayed for in the Complaint. *See* TRIAL EX. 1; TRIAL EX. 3.

12

Although the Plaintiff's Complaint did not expressly seek a determination of nondischargeability as to the $20,000.00 dishonored check, at trial, Mr. Fischl testified that he was seeking such a determination, and accordingly, the court will include this determination herein, since it is nevertheless a debt of the Debtor, incurred prior to the filing of her bankruptcy petition, and thus subject to discharge unless otherwise ordered. However, because the court finds no fraud in the inducement, the elements of § 523(a)(2)(A) are not satisfied, and the debt cannot be determined nondischargeable.

At trial, Mr. Fischl testified that he began discussions with Mr. Guider in November or December 2002, at which time, following the Plaintiff's standard procedure with new customers, he sent Concrete Maintenance a credit application and other documentation to be completed and returned. Concrete Maintenance did not return these completed documents. The Plaintiff nonetheless agreed to ship materials and supplies on December 10, 2002. Furthermore, the Plaintiff deviated from its normal operating procedures by shipping prior to receipt of payment. The $20,000.00 dishonored check, presented to Mr. Fischl more than one month later in January 2003, was for payment of an outstanding invoice. Nothing in the record evidences that, at the time the debt was incurred, the Debtor intended to defraud the Plaintiff by presenting it with a check that would later be unpaid due to insufficient funds. Although the parties both testified to events with respect to the actual presentment of the check that could arguably be determined to be fraudulent

13

or negligent,[6] the same cannot be said for the actual incurring of the debt on December 10, 2002, which is what § 523(a)(2)(A) requires.

With respect to the invoices included within the Judgment, in order to fully explain the analysis, they must be broken down between those arising prior to February 14, 2003, and those arising after August 24, 2003. First, with respect to those debts arising between December 17, 2002, and February 13, 2003, there are no representations made by the Debtor in the record upon which the Plaintiff can establish the reliance issue. During this time period, the Plaintiff made five shipments to Concrete Maintenance, for which the invoices total $38,437.46. With the exception of the December 21, 2002 shipment, there is nothing in the record concerning any sort of representation whatsoever with respect to these shipments totaling $3,888.66. With respect to the December 31, 2002 shipment, with an invoice value of $34,548.80, Mr. Fischl testified that he and Concrete Maintenance had an agreement that these materials were to be placed in inventory and paid for as sold. There is, however, no written evidence to support this testimony, nor is there any evidence that Concrete Maintenance was formed to provide sales of products outside the scope of concrete finishing. Furthermore, the Plaintiff had already supplied Concrete Maintenance with materials valued at $20,538.66 without accepting payment in advance, which was a deviation from the Plaintiff's normal operating procedures. Accordingly, the court cannot find that the record

---

[6] In January 2003, Concrete Maintenance had applied for a loan with Branch Bank & Trust in order to exercise an option to purchase its business premises and to pay its past due accounts, including monies owed to the Plaintiff. The Debtor testified that, believing that the loan would be forthcoming and at the request of Mr. Guider, she issued the $20,000.00 check, payable to the Plaintiff, which was to be paid to Mr. Fischl in person during a trip to Texas by the Debtor and Mr. Guider in January 2003. The Debtor testified that, immediately prior to leaving for Texas, she learned that the loan had fallen through, and she told Mr. Guider to destroy the check, but he presented it to Mr. Fischl without her knowledge. The Debtor acknowledged that she, personally, did not advise Mr. Fischl that the loan was not coming, but she trusted her son to do so. Mr. Fischl testified that it was actually the Debtor who presented him with the check. Despite the inconsistent testimony of the parties, the fact remains that the dishonored check does not satisfy the elements required by § 523(a)(2)(A).

14

supports a finding that Concrete Maintenance fraudulently induced the Plaintiff to forward any of the shipments occurring between December 17, 2002, and February 13, 2003.

With respect to the shipments from August 25, 2003, until October 16, 2003, the Plaintiff avers that the Debtor made oral representations of payment and sent the August 29, 2003 letters in order to induce the Plaintiff to make further shipments. Based upon Mr. Fischl's testimony, it appears that Ms. Trentham sent her August 29, 2003 letter to American Fidelity because Mr. Fischl requested something in writing to establish that Concrete Maintenance was attempting to obtain a loan to pay its past due accounts. In response, Mr. Bailey sent the August 29, 2003 letter from American Fidelity. Although the Debtor signed the letter from American Fidelity, she did not draft this letter nor was it a letter from Concrete Maintenance. The Debtor testified that Concrete Maintenance had never performed well and was attempting to obtain the loan from American Fidelity to pay off everything that was owed, including the amounts owed the Plaintiff on its past due invoices as well as the outstanding $20,000.00 dishonored check. The Debtor also acknowledged that she told Mr. Fischl that as soon as she got the funds to do so, the Plaintiff would be paid; however, the American Fidelity loan was not approved and never closed.

Additionally, even though Ms. Trentham's letter came from Concrete Maintenance, it did not come from the Debtor, individually. Furthermore, the letter was sent to American Fidelity, not the Plaintiff, in order to provide wire transfer information for the Plaintiff in the event the loan was approved and closed. There is nothing in the record to establish that Ms. Trentham's letter is fraudulent, and, in fact, Mr. Fischl testified that he always believed Ms. Trentham to be honest in

their dealings.  Finally, when questioned about what was false about this letter on its face, Mr. Fischl

answered that it was false because it was not fulfilled.

The Plaintiff has also failed to show how it reasonably relied upon representations made by

the Debtor to its detriment.  Mr. Fischl testified that the Plaintiff deviated from its normal business

operations by providing materials to Concrete Maintenance without requiring advance payment.

However, following the $20,000.00 insufficient check in early 2003, the Plaintiff began requiring

advance payments via bank draft or credit card.  This procedure continued until August 2003, when

the Plaintiff again began forwarding shipments to Concrete Maintenance prior to receiving payment.

Mr. Fischl testified that he agreed to allow the shipments, beginning on August 25, 2003, because

Concrete Maintenance needed the materials in order to complete its job at the Flying J Truckstop

so that funds would be available to pay his claim.  Accordingly, the Plaintiff made the following

shipments to Concrete Maintenance without requiring advance payment:  (1) on August 25, 2003,

materials invoiced for $17,100.00; (2) on August 26, 2003, materials invoiced for $5,450.00; (3) on

September 3, 2003, materials invoiced for $3,770.00; (4) on September 11, 2003, materials invoiced

for $396.00; (5) on October 2, 2003, materials invoiced for $5,898.00; and (6) on October 16, 2003,

materials invoiced for the aggregate amount of $15,562.80, including freight charges.  *See* TRIAL

EX. 14.

At trial, Mr. Fischl testified that the Plaintiff made these shipments in reliance on the

representations made by the Debtor that the Plaintiff would be paid once the American Fidelity loan

closed and once the Flying J Truckstop job was completed and upon the two letters dated August 29,

2003, from Ms. Trentham and American Fidelity, respectively.  The record, however, does not

16

support Mr. Fischl's testimony.  First, and most obviously, since the August 29, 2003 letters were not yet in existence, the Plaintiff could not have relied upon them when it shipped materials to Concrete Maintenance on August 25 and 26, 2003.  Arguably, however, the Plaintiff could have relied upon the August 29, 2003 letters when it made the remaining shipments between September 3, 2003, and October 16, 2003, since they occurred after August 29, 2003.  The court finds, however, that it was not these letters that the Plaintiff was relying upon.  Mr. Fischl testified that he telephoned the Flying J Truckstop in order to confirm that Concrete Maintenance was in fact performing a job for which it needed materials and that it would be paid following completion of the job, and after receiving confirmation, he agreed to forward the materials on August 25, 2003. The court finds that it was this information received from Flying J Truckstop, and not the Debtor or Concrete Maintenance, upon which the Plaintiff placed its reliance when it agreed to make subsequent shipments without advance payment.

Nevertheless, even if the court were to accept the Plaintiff's argument that it relied upon the August 29, 2003 letters when it made all shipments after that date, such reliance was not justifiable. The American Fidelity letter to Mr. Fischl, signed by one of its assistant vice presidents, Mr. Bailey, expressly states that the loan is "expected to close during the first two weeks of September[,]" but "[a]fter receipt of a few other requested documents from CMS, and final due diligence from the bank, we will finalize our document preparation and set a closing[.]"  TRIAL Ex. 7.  This letter, on its face, evidences that the loan to Concrete Maintenance was contingent on American Fidelity receiving additional documents from Concrete Maintenance and upon American Fidelity performing its final due diligence.

Furthermore, both the American Fidelity letter and Ms. Trentham's letter state that they expect to close the loan within the first two weeks of September, but a closing never took place. Nonetheless, on October 16, 2003, the Plaintiff, knowing the American Fidelity Loan had not closed, forwarded materials with an aggregate invoice total of $15,562.80. Based upon all of the foregoing facts, the court finds that the Plaintiff did not justifiably rely upon any oral representations of the Debtor and/or anyone else at Concrete Maintenance, upon the August 29, 2003 letter from Ms. Trentham to American Fidelity, or upon the August 29, 2003 letter from American Fidelity when it shipped materials to Concrete Maintenance between August and October 2003.

In summary, the Plaintiff has not met its burden of proof and, accordingly, all debts of Concrete Maintenance owed the Plaintiff that may for whatever reason be the responsibility of the Debtor were discharged on February 17, 2005. The Complaint will be dismissed.

### III

Also before the court is the Debtor's counterclaim seeking a determination that the Plaintiff willfully violated the automatic stay by pursuing criminal charges against the Debtor in Dallas County, Texas.

The commencement of the Debtor's bankruptcy case triggered the protection of the automatic stay, set forth in § 362(a), which provides, in material part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301 . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before

18

the commencement of the case under this title, or to recover a claim against
the debtor that arose before the commencement of the case under this title[.]

. . . .

(b) The filing of a petition under section 301 . . . of this title . . . does not operate as
a stay—

(1) under subsection (a) of this section, of the commencement or continuation
of a criminal action or proceeding against the debtor[.]

. . . .

(h)  An individual injured by any willful violation of a stay provided by this section
shall recover actual damages, including costs and attorneys' fees, and, in appropriate
circumstances, may recover punitive damages.

11 U.S.C.A. § 362.  The automatic stay remains in effect throughout the pendency of the bankruptcy

case pending discharge, providing debtors with "'a breathing spell' from collection efforts and []

shield[s] individual creditors from the effects of a 'race to the courthouse,' thereby promoting the

equal treatment of creditors."  *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001).  Actions

taken in violation of the automatic stay are "invalid and voidable and shall be voided absent limited

equitable circumstances."  *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993).

Criminal prosecution is an exception to the automatic stay.  *See* 11 U.S.C.A. § 362(b)(1).

In other words, parties may pursue criminal actions against a debtor without violating the stay in

order to "assist[] the prosecuting authorities in their rightful duties in protecting society by

punishment for violation of the criminal laws[.]"  *Williamson-Blackmon v. Kimbrell's of Sandford,

N.C., Inc. (In re Williamson-Blackmon)*, 145 B.R. 18, 21 (Bankr. N.D. Ohio 1992) (citations

omitted).

Based upon the record, the court finds that there has been no violation of the automatic stay, as criminal charges with respect to the $20,000.00 dishonored check are excepted from the stay by § 362(b)(1). Clearly, Mr. Fischl wants to be paid the money that is owed to the Plaintiff, but the fact that he has admitted his desire to be repaid is not, in and of itself, a stay violation. First, there is some question as to when Mr. Fischl actually began pursuit of criminal charges against the Debtor in Dallas County, Texas. The record clearly reflects that Mr. Fischl first contacted the Blount County District Attorney no later than April 2004, prior to the commencement of the Debtor's bankruptcy case. Upon learning, on August 6, 2004, that the district attorney would not pursue the matter in Blount County, Mr. Fischl testified that he immediately, on that same date, went to the district attorney for Dallas County, Texas. This testimony is somewhat conflicting with testimony given by Mr. Fischl at his deposition on July 15, 2005, when he testified that he did not remember the date that he went to the authorities in Texas. *See* TRIAL EX. 22, at p. 26, lines 21-23. Also, when questioned about the timing with respect to the Debtor's bankruptcy case, Mr. Fischl testified as follows:

> Q: Do you recall whether at the time you met with Mr. Gaulding [the head of the Bad Check Division for the Dallas County District Attorney's Office] it was before or after Ms. Cupp filed her bankruptcy?
>
> A: I can't remember that. I do remember asking him, after I found out about the filing, of her filing for bankruptcy, I did ask him what is the status, how would that affect this.

TRIAL EX. 22, at p. 27, lines 2-8. Although the Debtor argued differently, this testimony does not evidence that Mr. Fischl first contacted the district attorney in Texas after the Debtor filed her bankruptcy case; it only evidences that he brought the bankruptcy case to their attention once he received notice thereof.

The Debtor also relies upon Mr. Fischl's motives in seeking criminal charges against her, arguing that his sole intention was to collect his money, which Mr. Fischl acknowledged during his deposition as follows:

Q:  What was your purpose in going to the Attorney General's Office in Dallas?

A:  Because I had gone to the District Attorney here in Blount County, and asked them, begged them to do something about this, because I felt it was a felony; to no avail.

Q:  What were you trying to achieve when you went to the Attorney General's Office in Dallas?

A:  I wanted – I run a business.  I can't have somebody give me a bad check for 20,000 dollars and not miss it.  I need the money for my cash flow.  And I haven't had it in two or three years now.

Q:  Do I understand then that you wanted to be paid on the check that was returned for insufficient funds?

A:  That's the only reason I went to the District Attorney.

TRIAL EX. 22, at p.27, line 13 through p.28, line 2.  At trial, Mr. Fischl again gave somewhat conflicting testimony, stating that he thought it was a felony to write a bad check and that although he did want to be paid, he also contacted the district attorneys to find out what his rights were legally with respect to this dishonored check.

Additionally, the Debtor argues that Mr. Fischl's motives were apparent when he approached the Blount County District Attorney, as reflected by the following statement in his August 6, 2004 letter:  "I appreciate the fact that you are a very busy person, but I need to know when you are going to handle this matter.  $20,000 is a lot of money to be swindled out of especially since I bent over back wards trying to help Mrs. Cupp."  TRIAL EX. 4.

21

There is case law holding that the bankruptcy court must look at the motivation of the party initiating a criminal complaint, particularly in cases involving bad checks.  *See Batt v. Am. Rent-All (In re Batt)*, 322 B.R. 776, 779 (Bankr. N.D. Ohio 2005); *In re Muncie*, 240 B.R. 725, 727 (Bankr. S.D. Ohio 1999) (holding that § 362(b)(1) does not apply when the creditor initiates a criminal action in order to collect a debt).  The *Batt* court held that "[a]ctions taken, however, under the guise of a criminal prosecution, but having as their true motive the collection of a debt, are a different matter; it is well established that a creditor . . . is not permitted to employ the criminal judicial process as a means to collect a debt[,]" and that "ascertaining a single motive is extremely difficult; a creditor's motive is likely to be mixed by both a desire to punish the debtor as well as by a desire to collect on its debt."  *Batt*, 322 B.R. at 779.

> In a situation potentially involving a mixed motive, deference must be given to the strong policy consideration underlying the adoption of § 362(b): that bankruptcy is to protect those in financial, not moral difficulty, and therefore bankruptcy is in no way to be used as "a haven for criminals."  *Weaver v. City of Knoxville (In re Thomas)*, 179 B.R. 523, 529 (Bankr. E.D. Tenn 1995) (citing H.R.REP. NO. 595, 95TH CONG., 1ST SESS. 342 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6299).  It follows then, that so long as the creditor's primary motive is not the collection of a debt, but instead encompasses a true desire to see to it that the debtor is punished from violating the applicable criminal laws, no stay violation will exist for a creditor simply bringing the transgression to the attention and then cooperating with the person or agency charged with enforcing the criminal laws of the jurisdiction.

> While ascertaining a creditor's underlying motive is obviously a factually intensive inquiry, helpful considerations may include whether it is the creditor's standard procedure to initiate criminal proceedings and the time-line of the surrounding events.  Still, the burden of putting forth evidence regarding motive falls upon the debtor.  That is, when a debtor is involved in the commencement or continuation of a criminal matter, the burden falls upon him to establish the inapplicability of § 362(b)(1)'s exception to the stay.

*Batt*, 322 B.R. at 779-80 (internal citations omitted).

Other courts have disagreed with this type of analysis, instead relying only upon the clear wording of the statute.

> The Bankruptcy Code declares that § 362 does not stay "the commencement or continuation of a criminal action or proceeding against the debtor." It is a clear and straightforward declaration. There is no hint of any exception for prosecutorial purpose or bad faith. If the statutory command of the Bankruptcy Code is clear, we need look no further: it must be enforced according to its terms. The plain language of the statute is both unambiguous and unequivocal and excepts the application of the automatic stay to criminal proceedings. This Court finds the Bad Check Prosecutions to be criminal proceedings.

*Pickett v. Quinn (In re Quinn)*, 321 B.R. 663, 668 (Bankr. D. Vt. 2005) (internal citations omitted); *see also Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1085 (9th Cir. 2001) ("On its face, [§ 362(b)(1)] does not provide any exception for prosecutorial purpose or bad faith. If the statutory command of the Bankruptcy Code is clear, we need look no further: it must be enforced according to its terms."); *In re Bibbs*, 282 B.R. 876, 880 (Bankr. E.D. Ark. 2002) (holding that § 362(b)(1) includes all criminal prosecutions, including those for writing bad checks where restitution is a remedy); *In re Hartung*, 258 B.R. 210, 214 (Bankr. D. Mont. 2000) ("The protections afforded by § 362(a) are not so broad as to forestall a creditor's right to report a crime. Indeed, citizens have an obligation to report crimes in order to protect society and to maintain the integrity of our criminal justice system. Once a crime is reported, the county attorney's office then makes an independent decision as to whether criminal proceedings are warranted based upon the facts as presented.").

The court agrees with the later line of cases, finding that the clear wording of the statute does not require or even allow an analysis based upon the motives of the party initiating the criminal complaint, and therefore, Mr. Fischl's motives when he first approached the authorities in either

Tennessee or Texas are inconsequential with respect to whether the criminal prosecution violated the automatic stay. Furthermore, it was the district attorney for Dallas County, Texas, that presented the criminal charges to the grand jury, which in turn, returned an indictment against the Debtor. Mr. Fischl did not cause a criminal warrant to be issued against the Debtor as a first step to obtaining the indictment.[7] Once Mr. Fischl made the initial complaint and supplied the district attorney's office with his documentation, the decision whether or not to proceed with prosecution rested solely with the district attorney's office, not with Mr. Fischl. Although he has admitted to contacting the criminal court clerk concerning a trial date and other matters, on several occasions, such contacts are not violations of the automatic stay.

## IV

Finally, the Debtor has requested a permanent injunction, enjoining the Plaintiff from seeking or accepting restitution in the criminal case pending in Dallas County, Texas. Although a bankruptcy court may grant injunctive relief pursuant to its equitable powers under 11 U.S.C.A. § 105(a) (West 2004), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title[,[8]]" and pursuant to Federal

---

[7] *See supra* n.1. The court does not profess any degree of expertise in the area of criminal law. It does, however, distinguish between a criminal warrant issued at the behest of an alleged victim charging an individual with an indictable offense, and the indictment itself, which is returned by the grand jury. The only proof regarding the issuance of a warrant in this adversary proceeding arises from the Debtor's testimony that she was served with a warrant for her arrest subsequent to her indictment by the Dallas County Grand Jury on August 12, 2005. There is no proof that the Plaintiff, through Mr. Fischl or anyone else, sought or obtained the issuance of a criminal warrant against the Debtor prior to the return of the indictment.

[8] "The basic purpose of section 105 is to [provide] the bankruptcy courts [with the] power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." *Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999) (quoting 2 COLLIER ON BANKRUPTCY ¶ 105-5 to -7 (Lawrence P. King ed., 15th ed. 1999)). Nevertheless, courts should exercise their § 105(a) power sparingly. *Nasco P.R., Inc. v. Chemical Bank (In*

(continued...)

24

Rule of Bankruptcy Procedure 7065, which states that Federal Rule of Civil Procedure 65, providing

for the issuance of injunctive relief, "applies in adversary proceedings[,]" FED. R. BANKR. P. 7065,

"[a] court of the United States may not grant an injunction to stay proceedings in a State court except

as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to

protect or effectuate its judgments."  28 U.S.C.A. § 2283 (West 1994).

Here, the court has determined that the continued prosecution of the criminal case against

the Debtor in Texas is not a violation of the automatic stay.  The fact that the criminal court in Texas

could possibly award the Plaintiff restitution does not change this determination, such that the

bankruptcy court can interfere with the indictment handed down and being prosecuted by the State

of Texas.

> The fact that restitution is one of the objectives of the state criminal proceeding, or
> even the main objective, does not warrant this Court's interference with the criminal
> proceeding.  *See, e.g., In re HBG Servicenter, Inc.*, 45 B.R. 668, 673 (E.D. N.Y.
> 1985).  Bankruptcy is a civil proceeding having as its objective the relief of the
> debtor through either discharging his or her debts, or providing a method for their
> payment.  Id.  Criminal proceedings such as the Bad Check Prosecutions have as
> their objective vindication of the public policy of the State and the punishment and
> rehabilitation of offenders of that policy.  Id.  Restitution is one of the forms of
> punishment under 13 V.S.A. § 2002.  The fact that the underlying debts for which
> restitution may be sought were discharged by an order of this Court does not
> emasculate the viability of the criminal proceeding.

*Quinn*, 321 B.R. at 668 (footnote omitted) (analyzing Vermont law).  The court agrees that "under

the notions of federalism, this Court finds that it should not interfere with a state court criminal

proceeding."  *Quinn*, 321 B.R. at 669 (citing *Younger v. Harris*, 401 U.S. 37, 27 L. Ed. 2d 669, 91

---

[8](...continued)
*re Nasco P.R., Inc.)*, 117 B.R. 35, 38 (Bankr. D.P.R. 1990).

S. Ct. 746 (1971)).  Accordingly, the Debtor's request for injunctive relief shall, through the dismissal of her counterclaim, be denied.

A judgment consistent with this Memorandum will be entered.

FILED: March 16, 2006

BY THE COURT

*/s/ RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE